## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

IOWA PACIFIC HOLDINGS, LLC,

      Plaintiff,

vs.

NATIONAL RAILROAD PASSENGER
CORPORATION,

      Defendant.

---

## PLAINTIFF'S VERIFIED COMPLAINT
## FOR INJUNCTIVE AND OTHER RELIEF

---

Plaintiff, IOWA PACIFIC HOLDINGS, LLC ("IPH"), by its undersigned attorneys and as its Verified Complaint for Injunctive and Other Relief against Defendant NATIONAL RAILROAD PASSENGER CORPORATION ("Amtrak"), states:

### PARTIES

1.      IPH is an Illinois limited liability company with its principal offices at 118 South Clinton Street, Suite 400, Chicago, Illinois 60661.

2.      Amtrak is a corporation organized under the Rail Passenger Service Act (recodified at 49 U.S.C. §24101 *et seq.*) and the laws of the District of Columbia, with its principal place of business either in Washington, D.C. or a state other than Illinois.

3.      Amtrak and IPH are parties to an oral agreement for Amtrak to provide train and engine crews and operate a special train service between Denver, Colorado and Winter Park, Colorado between December 27, 2009 and March 28, 2010 (the "Ski Train Service").

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the matter pursuant to 28 U.S.C. §1332(a)(1)(Diversity of Citizenship).

5.      Venue is proper in Denver County, Colorado pursuant to 28 U.S.C. §1391 (a)(1) in that Amtrak resides in this District within the meaning of 28 U.S.C. §1391(c) because it is subject to personal jurisdiction here at the time of the commencement of this action. Additionally, venue is proper here pursuant to 28 U.S.C. §1391 (a)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## NATURE OF THE CONTROVERSY

6.      Amtrak has recently anticipatorily repudiated its agreement to provide the Ski Train Services pursuant to the parties' oral contract. As the Ski Train Services are scheduled to begin on December 27, 2009, IPH seeks to specifically enforce the parties' agreement in order to avoid the irreparable harm that will be suffered by IPH if it is forced to cancel the Ski Train Service and throw the holiday and vacation plans of thousands of prepaid passengers into disarray.

## BACKGROUND FACTS

7.      IPH is in the business of acquiring and operating smaller feeder and short line railroads throughout the United States, and also owns and operates freight car repair shops in conjunction therewith. IPH also operates scenic excursion trains in Arizona, Oregon, and in Southern Colorado.

8.      In December of 2005, IPH acquired and began running the San Luis & Rio Grande Railroad, which among other places runs west from Walsenburg, Colorado, over the

Sangre de Cristo Mountains into the valley of the San Luis and Rio Grande Rivers. At Alamosa, the railroad splits with a branch extending south to Antonito and northwest to South Fork.

9.    Along that same railroad, IPH now operates excursion passenger trains under the name Rio Grande Scenic Railroad (the "RGSR"). Among other things, the RGSR operates excursion trains that run between Alamosa and La Veta, Monte Vista and Antonito.

10.    Between 1940 and the spring of 2009, companies other than IPH ran a passenger ski train between Union Station in Denver and Winter Park, Colorado (the "Ski Train"). In April 2009, the operator of the Ski Train, the Anschutz Corporation, announced the sale of the train and the end of its run.

11.    Since August of 2009, and at great cost and effort, IPH has worked with the Union Pacific Railroad, Amtrak, Winter Park Resort, the City of Denver, the State of Colorado, the Denver Union Station Project Authority, the RTD, the Anschutz Corporation, the Federal Railroad Administration and other organizations to revive the historic Ski Train for the 2009-2010 season. IPH's Ski Train is set to begin service on December 27, 2009 and continue until late March 2010, carrying up to 1,700 passengers on each trip.

12.    IPH first began discussing a charter arrangement with Amtrak to provide the Ski Train Services and operate the Ski Train in August of 2009. IPH did so at the request of Union Pacific Railroad, presumably because of Amtrak's extensive experience in operating passenger trains over Union Pacific's freight lines. Moreover, since 1970 and the passage of the Rail Passenger Service Act, control of intercity passenger rail service has been vested exclusively in Amtrak's hands, and Amtrak also has exclusive third-party access to freight railroad tracks. Unlike Amtrak, IPH has no right to operate passenger trains over freight railroad lines.

13.     From the beginning, the proposed arrangement between the parties was that Amtrak would operate the Ski Train through its provision of locomotive crews, while IPH would provide the locomotive and passenger cars and other aspects of the service.

14.     Between August 12 and October 21, 2009, IPH diligently worked with Amtrak personnel involved in the proposed Ski Train operation, and received a price quote of $13,000 per train, not including use of Denver Union Station.

15.     On or about October 19, 2009, IPH met with Amtrak representatives in Washington, D.C. to discuss additional details of the proposed Ski Train Service.   On October 21, 2009, Teresa Hughey, Amtrak's Director of Charter & Group Services, sent IPH its standard Charter Train Contract (the "CTC").  A true and correct copy of the CTC is attached hereto as Exhibit A, and a true and correct copy of her transmittal email is included in Group Exhibit B.

16.     The CTC is entirely consistent with the arrangement as conceived from inception (as well as the parties' subsequent communications and arrangements as evidenced in part by Group Exhibit B) in that it provides in section 101 that "Amtrak may provide the Charter Transportation using a Charter Train comprised in whole or in part of Amtrak-approved rail equipment provided by [IPH] or its agents."  As set forth above, at all material times IPH indicated that it would be providing the locomotive and passenger cars for the Ski Train, to which Amtrak agreed.

17.     The CTC also contains standard, commercially reasonable indemnification and insurance provisions. Ms. Hughey's October 21, 2009 transmittal email specifically directs IPH to the CTC's standard terms in that regard, namely sections 405 and 406.  For example, section 406 of the CTC requires IPH to obtain general liability insurance coverage in the amount of

$2,000,000 per occurrence, with Amtrak named as an additional insured under the policy. See Exhibit A at section 406.

18.     IPH orally indicated its assent to the CTC's standard terms regarding Insurance and Indemnification on several occasions. One such indication of assent (from IPH's Ed Ellis to Ms. Hughey) is included in Group Exhibit B.

19.     The terms proposed in the CTC were entirely consistent with Amtrak's prior contractual agreements with IPH. Specifically, IPH and/or wholly owned subsidiaries like High Iron Travel Corp., have chartered day and overnight excursion passenger trains with Amtrak for almost 20 years pursuant to terms nearly identical to those included in the CTC.

20.     Since at least October 21, 2009, IPH has reasonably relied on Amtrak's promise to provide the Ski Train Services pursuant to the standard terms of the CTC and the agreed price of $13,000 per train. More specifically, between October 19, 2009 and December 8, 2009, IPH spent and/or committed to spend approximately $621,233.19 to complete the Ski Train charter arrangement, including expenditures for: the acquisition and preparation of a fleet of 12 passenger railroad cars and two locomotives to replace those sold by the prior operator; the construction of passenger loading equipment to be used at Denver Union Station and Winter Park; the expansion of an existing reservation call center to handle anticipated reservations for the Ski Train and the purchase of a new reservation software system specifically designed to be used for the Ski Train; the hiring of staff to operate the Ski Train; the lease of commercial office space in City of Denver specifically for Ski Train staff; the creation of a website to market and promote the Ski Train; the advertising of the Ski Train via print, television and Internet; the training of over 100 volunteers to work on the Ski Train; the selection and hiring of catering

staff, security staff and cleaning staff for the Ski Train;  and the preparation of an operating plan prepared for the Federal Railroad Administration ("FRA").

21.     Further, since December 8, 2009, IPH has spent over $200,000 in additional funds for these items and to perform its obligations pursuant to the parties' agreement.

22.     As a result of its considerable marketing and advertising efforts, IPH has already sold approximately 13,000 tickets for the Ski Train.

23.     As of October 21, 2009, Amtrak itself had already begun coordinating the equipment inspections and third party approvals, and obtaining the crews and other resources required by the parties' charter arrangement.

24.     Between October 19, 2009 and November 2, 2009, the parties discussed and orally agreed to all remaining material terms pertaining to the Ski Train charter, including price terms, train schedules and crews.[1]   Most of these terms were discussed and agreed between Ed Ellis of IPH and Ms. Hughey of Amtrak.  At all relevant times, Ms. Hughey had the actual or at least apparent authority to bind Amtrak.

25.     On November 2, 2009, Ms. Hughey of Amtrak sent an email to Ed Ellis of IPH, a true and correct copy of which is attached hereto as Exhibit C.  The November 2, 2009 email indicates that Amtrak and IPH in fact had a fully negotiated agreement, in that in the email Ms. Hughey again makes it clear that Amtrak had already started to perform the parties' agreement by obtaining the necessary resources within Amtrak and obtaining the outside approvals contemplated by the CTC.

26.     Ms. Hughey's November 2, 2009 email again explicitly confirms the parties' agreement to the insurance terms of the CTC.   Although in her email Ms. Hughey also

---

[1] The only part of the deal necessarily in flux was the "train consist", that is the list of actual locomotives and passenger cars that would be provided by IPH and operated by Amtrak, because of availability and condition.

mentioned getting IPH a contract by "next week", that merely refers to a written contract that reflects the parties' oral agreement on all terms, including the terms in the standard CTC.

27.    In light of the foregoing, Amtrak should have known – and on information and belief did know from its past experiences with IPH and High Iron and its communications with IPH -- that IPH would rely on the CTC, the November 2, 2009 email, and in general the parties' pre- December 8, 2009 understandings to begin preparing, planning and marketing the Ski Train excursion.

28.    Beginning on or about December 8, 2009, however, Amtrak has in bad faith attempted to renege on its arrangements with and promises to IPH regarding the Ski Train charter.

29.    More specifically, on December 8, 2009, Michael Franke of Amtrak forwarded a new proposed contract with provisions that the parties had not previously discussed.   In particular, the Insurance and Indemnification provisions of the proposed contract materially deviated from the CTC provisions to which the parties had previously agreed.  In fact, Amtrak must have known that many of the new Insurance and Indemnification terms demanded of IPH were impossible to meet and, therefore, they must have been interposed as an excuse for Amtrak to get out of the Ski Train charter altogether. A true and correct copy of Amtrak's proposed agreement is attached hereto as Exhibit D.

30.    Apart from the Insurance and Indemnification terms and the description of IPH in the proposed agreement as an operating railroad or operator of the Ski Train, the agreement proposed by Amtrak and attached as Exhibit D accurately reflects the oral terms previously agreed to by the parties -- except again for the train consist, which was not yet finalized.

31.    In the new proposed agreement, Amtrak demanded in section 7 that IPH obtain insurance coverage of $200,000,000 million, with Amtrak, Union Pacific and BNSF added as named insureds, and which would cover acts of terrorism and affirmatively provide coverage for punitive damages. See Exhibit D at section 7.

32.    Not only did the parties not discuss nor agree to such a provision, insurance policies containing such terms are not available to IPH on commercially reasonable terms. In fact, the public policy of the State of Colorado prohibits insurance carriers from providing insurance coverage for punitive damages. *See Lira v. Shelter Ins. Co.*, 913 P.2d 514, 517 (Colo. 1996), (prohibiting coverage on the basis that punitive damages are not meant to reimburse an injured plaintiff for harm suffered by that individual, but rather are intended to punish the defendant for his wrongful acts and to deter similar conduct in the future).

33.    By knowingly demanding IPH's acquiescence to terms with which it was not possible to comply, since December 8, 2009, Amtrak has in bad faith reneged on its prior agreement to provide IPH with Charter Transportation for the Ski Train in accordance with the terms identified above. Indeed, Amtrak has admitted as much to IPH in subsequent meetings, most recently on December 17, 2009. Notwithstanding their impossibility, Amtrak has continued to insist that IPH agree to these new provisions, thereby anticipatorily repudiating the parties' prior agreement.

34.    The "drop-dead" date for completing the parties' Ski Train charter arrangement is Tuesday, December 22, 2009, the day before Amtrak must operate an FRA-requested test train. The December 23, 2009 date for the test train is the last possible date for operation of the test train prior to the first Ski Train, which is scheduled to depart December 27, 2009.

35.     Given Amtrak's exclusive rights as set forth above, it is impossible for IPH to find another provider for the Ski Train Services.

36.     Should Amtrak be permitted to renege on its agreements and promises to provide the Ski Train Services, IPH will be irreparably harmed in that:  (a) the good will associated with its Rio Grande Scenic Railroad operation in southern Colorado will be damaged to an extent that is not ascertainable with money damages, particularly as the customers who have already purchased the approximately $100,000 of tickets sold to date will be forced to cancel their holiday plans or make alternative plans due to the cancellation of the Ski Train excursions; (b) IPH's reputation and good will within the railroad industry will be damaged to an extent that is not ascertainable with money damages, for the same reasons; (c) IPH will lose the publicity and good will attendant with reviving a 70-year old Colorado tradition; (d) as both the demise and the resurrection of the Ski Train were both extremely well publicized in Colorado, IPH's failure to run the Ski Train is likely to irreparably damage the public interest in and IPH's ability to run it in the future; and (e)  IPH will be stuck with modified and/or repaired passenger cars that it cannot use for other purposes.

37.     In addition, the public interest weighs in favor of maintaining the 70-year-old tradition of the Ski Train between Denver and Winter Park.  On the other hand, interfering with the holiday and vacation plans of thousands of Colorado passengers by permitting Amtrak to cancel the Ski Train will disserve the public interest.

## COUNT I
## BREACH OF CONTRACT

38.     For its paragraph 38 of Count I, IPH adopts and re-alleges paragraphs 1 through 37 as though fully set forth herein.

39.     Between October 19 and approximately December 7, 2009, IPH and Amtrak entered a valid oral agreement, definite and certain in its material terms and pursuant to which Amtrak agreed to provide the Ski Train Services from December 27, 2009 through late March 2010, in exchange for payment of $13,000 by IPH.

40.     The parties' agreement is supported by valid consideration, mutuality of obligation and remedy, namely Amtrak's providing train and engine crews to operate the Ski Train from December 27, 2009 through late March 2010, and IPH's payment to Amtrak of $13,000.

41.     IPH is ready, willing and able to perform the parties' agreement by the specified date of December 27, 2009 where it has already: acquired and prepared of a fleet of 12 passenger railroad cars and two locomotives; constructed passenger loading equipment to be used at Denver Union Station and Winter Park; expanded an existing reservation call center to handle anticipated reservations for the Ski Train; purchased new reservation software system specifically designed to be used for the Ski Train; hired staff to operate the Ski Train; leased commercial office space in the City of Denver specifically for the Ski Train staff; created a website to market and promote the Ski Train; advertised the Ski Train via print television and Internet; trained over one hundred volunteers to work on the Ski Train; selected and hired a catering, security and cleaning staff for the Ski Train; prepared an operating plan prepared for the FRA; and sold over $100,000 worth of tickets for the Ski Train.

42.     IPH has not engaged in any unfairness, fraud or overreaching.  To the contrary, IPH has been nothing but fair in its attempts to accommodate Amtrak.

43.     Any delays were not caused willfully by IPH and Amtrak has not been harmed by any such delays.

44.     Pursuant to the parties' agreement, Amtrak is obligated to provide Ski Train Services to IPH for the Ski Train from December 27, 2009 through the end of March 2010.

45.     Amtrak has breached the parties' agreement by: (1) unequivocally and positively expressing its intention not to perform the parties' oral agreement by affirmatively indicating to IPH that it wanted out of the parties' contract altogether and imposing additional impossible contract terms at the eleventh hour; and (2) dealing in bad faith by asserting a requirement during the eleventh hour that IPH obtain insurance coverage of $200 million to cover acts of terrorism and punitive damages, coverage that was never previously discussed and that Amtrak is well aware IPH is unable to obtain.

46.     The aforementioned breaches are material and go to the essence of the parties' agreement and substantially frustrate the purpose for which IPH entered the parties' agreement, that being to revive a 70-year-old tradition and take over operation of the Ski Train for the upcoming holiday and winter months.

47.     Amtrak's breaches, as described above, have directly and proximately caused IPH actual damages, including but not limited to, damages for: expenditures for the acquisition and preparation of a fleet of 12 passenger railroad cars and two locomotives; the construction of passenger loading equipment to be used at Denver Union Station and Winter Park; the expansion of an existing reservation call center to handle anticipated reservations for the Ski Train; the purchase of a new reservation software system specifically designed to be used for the Ski Train; the hiring of staff to operate the Ski Train; the lease of commercial office space in the City of Denver specifically for the Ski Train staff; the creation of a website to market and promote the Ski Train; the advertising of the Ski Train via print, television and Internet; the training of over one hundred volunteers to work on the Ski Train; the selection and hiring of a catering, security

and cleaning staff for the Ski Train; the preparation of an operating plan prepared for the FRA; the processing of refunds for over $100,000 worth of tickets already purchased for the Ski Train; and foreseeable lost profits and lost goodwill.

48.     Further, legal remedies such as money damages are inadequate to compensate IPH for the reasons set forth in paragraph 36 above.  Additionally, canceling service to the customers who already purchased the approximately $100,000 of tickets sold to date exposes IPH to a multiplicity of lawsuits if injunctive relief and specific performance of the parties' agreement are not granted.

49.     As set forth above, a mandatory injunction requiring Amtrak to perform pursuant to the parties' agreement by providing locomotive crews for the Ski Train would serve the public interest in and preserve the status quo of a 70-year-old tradition inextricably tied to the snow and winter sport industry in the affected areas of Colorado.  Denying a mandatory injunction would disserve the public interest and throw the holiday plans of thousands of passengers into disarray.

50.     The harm the IPH has suffered, and will continue to suffer, as a result of Amtrak's breaches outweighs any potential harm Amtrak may suffer as a result of the injunctive relief IPH seeks.

WHEREFORE, IOWA PACIFIC HOLDINGS, LLC respectfully requests that this Court enter judgment in its favor and against Defendant NATIONAL RAILROAD PASSENGER CORPORATION and for an Order: (1) specifically enforcing the parties' agreement, a general memorialization of which is attached hereto as Exhibit E; (2) preliminarily and permanently compelling Amtrak and all those acting on its behalf or in concert with it to perform parties' agreement by, among other things, providing locomotive crews; (3) to the extent this Court does not issue injunctive relief and/or specific performance, awarding IPH actual damages in an

amount to be determined at trial; (4) awarding IPH the reasonable costs and attorneys' fees incurred in bringing this action; (5) and awarding any other legal or equitable relief to IPH that this Court deems appropriate under the circumstances.

**COUNT II**
**PROMISSORY ESTOPPEL**
**(PLED IN THE ALTERNATIVE)**

51.     For its paragraph 51 of Count II, IPH adopts and re-alleges paragraphs 1 through 37 as though fully set forth herein.

52.     Between October 19 and December 7, 2009, Amtrak promised to provide locomotive crews to IPH to operate the Ski Train in exchange for $13,000.

53.     Amtrak should reasonably have known, and in fact must have known based on its communications and past experience with IPH and/or its subsidiaries, that IPH would rely on Amtrak's promises and begin preparations to organize, market and sell tickets for the Ski Train, including but not limited to, acquiring and preparing the necessary machinery and equipment, marketing and advertising, hiring and training staff and selling tickets.

54.     IPH did in fact rely on Amtrak's promise or offer to its detriment by performing the acts set forth above in 53.

55.     Given the nature and extent of IPH's reliance, a manifest injustice will result should Amtrak not be held to its promises.  Indeed, IPH has spent approximately more than $800,000 to hold up its end of the bargain and complete the charter arrangement, including obtaining special domed passenger cars for the excursion.

56.     IPH is ready, willing and able to perform the parties' agreement by the specified date of December 27, 2009.

57.     IPH has not engaged in any unfairness, fraud or overreaching.  To the contrary, IPH has been nothing but fair in its attempts to accommodate Amtrak.

58.     Any delays were not caused willfully by IPH and Amtrak has not been harmed by any such delays.

59.     Further and as set forth above, legal remedies such as money damages are inadequate to compensate IPH for the harm suffered.  Additionally, canceling service to the thousands of customers who have already purchased tickets to date exposes IPH to a multiplicity of lawsuits if injunctive relief and specific performance of the parties' agreement are not granted.

60.     A mandatory injunction requiring Amtrak to perform pursuant to the parties' agreement by providing locomotive crews for the Ski Train would serve the public interest in and preserve the status quo of a 70-year-old tradition inextricably tied to the snow and winter sport industry in these areas of Colorado.   On the other hand, not granting the injunction would disserve the public interest by throwing the holiday and vacation plans of thousands of passengers into disarray.

61.     The harm the IPH has suffered, and will continue to suffer, as a result of Amtrak's breaches outweighs any potential harm Amtrak may suffer as a result of the injunctive relief IPH seeks.

WHEREFORE, IOWA PACIFIC HOLDINGS, LLC respectfully requests that this Court enter judgment in its favor and against Defendant NATIONAL RAILROAD PASSENGER CORPORATION and for an Order: (1) specifically enforcing Amtrak's promise to provide Ski Train Services substantially along the lines of the terms set forth in Exhibit E; (2) preliminarily and permanently compelling Amtrak and all those acting on its behalf or in concert with it to perform Amtrak's promise by, among other things, providing locomotive crews; (3) to the extent

this Court does not issue injunctive relief and/or specific performance, awarding IPH actual

damages in an amount to be determined at trial; (4) awarding IPH the reasonable costs and

attorneys' fees incurred in bringing this action; (5) and awarding any other legal or equitable

relief to IPH that this Court deems appropriate under the circumstances.

Respectfully submitted,

IOWA PACIFIC HOLDINGS, LLC,

By: _____
One of its attorneys

Jeffery D. Bursell, Esq.
GODFREY & LAPUYADE, p.c.
9557 S. Kingston Court
Englewood, Colorado 80112
(303) 228-0700
(303) 228-0701 F

Of Counsel:
Gerald Haberkorn
Robert H. Smeltzer
Charlotte Felber
**LOWIS & GELLEN, LLP**
200 West Adams Street, Suite 1900
Chicago, Illinois 60606
(312) 364-2500
Firm I.D. 32517

## VERIFICATION

Under penalties as provided by law pursuant to 28 U.S.C. § 1746, the undersigned, Edwin Ellis, President of Iowa Pacific Holdings, LLC, certifies that the factual statements set forth in paragraphs __/__ through _60_ of the foregoing Verified Complaint are true and correct, except as to matters therein stated to be on information and belief and as to such matters, the undersigned certifies that he verily believes the same to be true.

_____
Edwin Ellis
President, Iowa Pacific Holdings, LLC