IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 09-cv-02977-REB-KLM

IOWA PACIFIC HOLDINGS, LLC,

    Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION,

    Defendant.

---

**DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR BREACH OF ORAL CONTRACT**

---

Pursuant to F.R.Civ.P. 56, Defendant National Railroad Passenger Corporation ("Amtrak") respectfully moves for summary judgment in its favor on Plaintiff, Iowa Pacific Holdings, LLC's ("IPH") claim for relief for breach of contract. In support of this Motion, Amtrak states as follows.

## INTRODUCTION AND SUMMARY OF MATERIAL FACTS

The events giving rise to this lawsuit began with the Anschutz Corporation's ("Anschutz") decision to cease operation of the Ski Train between Denver and Winter Park at the end of the 2008-2009 ski season. Compl. ¶ 10. The Ski Train operated for nearly seventy years. *Id.* In later years, it became increasingly difficult to operate the Ski Train profitably, due in large part to the increased cost of liability insurance. Ex. A

(Anschutz Website, Opp. to Mot. for TRO Ex. 2). Anschutz announced that the increased cost of liability coverage was a critical factor behind its decision to stop running the Ski Train. *Id.*

In August 2009 IPH began its efforts to revive the Ski Train, and began negotiating a contract with Amtrak for the operation of the Ski Train (the "New Ski Train"). Compl. ¶¶ 11-12. Those negotiations continued over several months, from August to December of 2009, but the parties never reached a final written contract. *Id.* ¶¶ 11-50. Negotiations broke down in large part due to IPH's unwillingness or inability to bear the cost of insurance necessary for the responsible operation of the New Ski Train. *Id.* ¶¶ 29-31. IPH now claims that an oral contracted existed for operation of the New Ski Train and that Amtrak breached the contract by refusing to operate the New Ski Train. *Id.* ¶¶ 39-45. Amtrak is entitled to judgment as a matter of law on the basis that no such oral contract existed based on the undisputed facts. In this motion Amtrak does not challenge IPH's alternative cause of action for promissory estoppel.

## PROCEDURAL HISTORY

IPH filed its Complaint on December 21, 2009, including claims for breach of oral contract and promissory estoppel. On December 22, 2009, IPH filed a Motion for Temporary Restraining Order and Mandatory Preliminary Injunction, which the Court denied as to the temporary restraining order the next day. IPH withdrew its preliminary injunction request on January 4, 2010. Amtrak filed its Answer on February 1, 2010.

# JURISDICTIONAL STATEMENT

Subject matter jurisdiction exists pursuant to 28 U.S.C. §§1332(a)(1) and 1349.

# ARGUMENT[1]

### A. IPH bears the burden of proof.

"The burden is on the plaintiff to prove all the elements in an action for breach of contract." *Banze v. Am. Int'l Exp., Inc.*, 454 A.2d 816, 817 (D.C. 1983).[2]

### B. IPH must prove the existence of a valid oral contract.

To prove breach of an oral contract, IPH must first show a valid oral contract between the parties. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). For a valid oral contract to exist, "there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995).

### C. The following material facts are admitted or undisputed.

IPH and Amtrak began negotiating a contract for the operation of the New Ski Train in August 2009. Compl. ¶ 12. On October 21, 2009, Amtrak sent IPH a "Charter Train Contract" containing blank spaces indicating the chartering party, number of

---

[1] This motion is governed by the familiar standard set forth in Fed. R. Civ. P. 56, under which a court should enter summary judgment if the moving party demonstrates that no genuine issue exists as to any material fact, and it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[2] The parties agree that District of Columbia law controls this dispute. Amtrak further notes its agreement with the Court's statement during the December 23, 2009 hearing in this matter that District of Columbia and Colorado law on breach of contract are substantially identical.

passengers, type of equipment, route, dates of service, and price, and requiring the chartering party to carry $2,000,000 in general liability insurance. Compl. Ex. A. On November 2, 2009, IPH President Ed Ellis asked Teresa Hughey, Amtrak's Director of Charter & Group Services, for "some kind of qualified approval." Compl. Ex. B. Hughey responded she would "send something in a separate e-mail," but asked Ellis to "bear in mind it will include contingencies and caveats." *Id.* Later that day, Hughey sent Ellis an e-mail discussing "the series of approvals necessary to operate the [New] Ski Train." Compl. Ex. C. Hughey stated: "Amtrak is continuing to process the necessary requests and approvals. I hope to have a contract to you next week." *Id.* IPH alleges that the date upon which all material terms were allegedly agreed was November 2, 2009. Compl. ¶ 24. On November 3, 2009, Ellis replied: "We will provide you with the insurance certificate upon execution of the contract, which you will provide to us sometime next week." Ex. B (E-mail from Ed Ellis, November 3, 2009 [Doc. 9, Ex. A p. 9]). On December 8, 2009, Amtrak sent IPH another "Charter Train Contract" complete with all material terms, as Amtrak proposed them. Compl. Ex. D. IPH disavows this contract because it requires IPH to obtain $200,000,000 in liability insurance. Compl. ¶¶ 31-32.

Before these discussions about the New Ski Train, IPH had an extensive charter train contracting relationship with Amtrak. *See* Ex. C (Clark Johnson Aff. ¶¶ 3–7 [Doc. 8-3]). IPH has "operated or sponsored innumerable special passenger trains" and has "extensive experience entering into charter arrangements with Amtrak." *Id.* Accordingly,

4

it knew that Amtrak generally does not provide final contracts until a few days before a proposed charter operation. *Id.* IPH also knew that Amtrak generally agrees in advance to an amount it will charge for the operation of a charter train, but until the final contract is provided, the agreed-upon price was considered to be an "educated guess" about what the actual price would be. *Id.*

### D. IPH cannot show there was a valid oral contract.

#### 1. Amtrak did not intend to be bound by oral representations.

On the basis of the undisputed material facts, no reasonable fact finder could conclude Amtrak intended to be bound by oral representations.

##### a. IPH's burden is "particularly onerous."

To create an enforceable oral contract, "both parties must intend to be bound by their oral representations alone." *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007) ("*Kagy*"). Where the parties have prepared written drafts, but no draft contains all the material terms, the burden of showing the parties agreed to be bound by their oral representations alone is "particularly onerous." *Novecon, Ltd. v. Bulgarian-American Enter. Fund*, 967 F. Supp. 1382, 1387 (D.D.C. 1997), *aff'd.*, 190 F.3d 556 (D.C. Cir. 1999); *accord Baker*, 664 A.2d at 1238, 1240–41.

The undisputed facts reflect that between early October and mid-December 2009 Amtrak and IPH had extensive communications concerning a potential contract for Amtrak to provide crews to operate the New Ski Train. Compl. ¶¶ 12-32. During those communications, Amtrak sent two draft agreements to IPH. Compl. Exs. A & D. The

5

first, sent on October 21, 2009, included many blank terms, including price, services to be provided, and equipment to be used. Compl. Ex. A Schedules A-D. IPH does not contend, nor could it, that the October draft was or reflected a binding agreement.

Amtrak sent its second draft to IPH on December 8, 2009. Compl. ¶¶ 31-32 and Ex. D thereto. While considerably more developed than the October draft, the December draft still left material issues unresolved, including the equipment to be used (the "train consist"). Compl. ¶ 30. And IPH vigorously rejected the December draft primarily based on its insurance and indemnification terms. *Id.* ¶¶ 31-32.

Instead of embracing either of the two draft agreements that Amtrak prepared, IPH claims that on November 2, 2009 an oral agreement was formed. *Id.* ¶ 24. Amtrak is entitled to judgment as a matter of law on this claim for two independent reasons: (1) the undisputed facts show that IPH cannot meet its "particularly onerous" burden of proving the existence of an oral contract arising from the negotiations concerning the form of a sophisticated business contract; and (2) the undisputed facts confirm that the parties never agreed to all material terms of any contract, oral or written.

### b. IPH does not meet its "particularly onerous" burden that Amtrak intended to be bound by its oral representations.

When faced with a motion for summary judgment, the court must "look closely at the parties' intention to be bound. In order to form a binding agreement, both parties must have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract." *See Baker*, 664 A.2d at 1239. If weighing the relevant

6

\\\DE - 065976/000021 - 443830 v6

factors overwhelmingly shows the defendant did not intend to be bound by an oral agreement, summary judgment in the defendant's favor must be granted. *See Kagy*, 473 F.3d at 1250; *Baker*, 664 A.2d at 1240-41.

### i. IPH had reason to know Amtrak did not intend to be bound.

An oral agreement does not constitute a contract if "either party knows or has reason to know that the other party regards the agreement as incomplete and intends that no obligation shall exist . . . until the whole has been reduced to . . . written form." *Kagy*, 473 F.3d at 1249 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. b (1981)). The parties' prior business dealings are a strong indicator of whether they intended to be bound by an oral agreement. *See Brisbin v. Superior Valve Co.*, 398 F.3d 279, 293 (3d Cir. 2005) (reversing trial court's finding of breached oral contract on grounds that prior dealings between the parties indicated the defendant did not intend to be bound until the agreement was formalized in writing).

IPH knew Amtrak's general practice was to agree to be bound only after executing a final written contract. In support of its motion for temporary restraining order and preliminary injunction, IPH submitted evidence showing it had an extensive charter train contracting relationship with Amtrak and thus knew that: (1) Amtrak generally does not provide final contracts until a few days before a proposed charter operation; (2) Amtrak generally agrees in advance to an amount it will charge for the operation of a charter train; but (3) until the final contract is provided, the agreed-upon price was considered to be an "educated guess" about what the actual price would be.

7

See Ex. C (Johnson Aff. ¶¶ 3–7). If IPH did not consider Amtrak's agreed-upon price to be binding before the execution of a final written contract, it cannot argue that it believed Amtrak intended to enter into an oral contract governing a much more involved arrangement than a simple day charter. See New Economy Capital, LLC v. New Markets Capital Group, 881 A.2d 1087, 1096–97 (D.C. 2005) (holding, as a matter of law, that an alleged oral agreement that is uncertain as to price "does not meet the requirements of completeness with respect to 'all material terms'" or "'intention of the parties to be bound'") (citing Baker, 664 A.2d at 1238).

### ii. Both parties anticipated a written contract.

Another clear indicator of Amtrak's intent not to be bound by an oral agreement is the October 21, 2009, Charter Train Contract itself. When contract negotiations originate with a writing, subsequent negotiations about the terms embodied in the writing "reflect the parties' intention not to be bound until a formal writing is executed." Edmund J. Flynn Co. v. LaVay, 431 A.2d 543, 547 (D.C. 1981); see Kagy, 473 F.3d at 1249 ("The fact that parties contemplate a writing is evidence, therefore, that they do not intend to bind themselves by an oral agreement.").

The e-mails between Amtrak and IPH after October 21, 2009, also show a formal writing was anticipated. It is undisputed that on November 2, 2009, IPH asked Amtrak for a "qualified approval." Compl. Ex. B. Amtrak responded that same day by stating it was "continuing to process the necessary requests and approvals," and "hope[d] to have a contract to [IPH] next week." Compl. Ex. C. The next day, Ellis confirmed that

\\\DE - 065976/000021 - 443830 v6

he too expected an executable contract "sometime next week." Ex. B (E-mail from Ed Ellis). Indeed, Ellis informed Hughey that he would "provide [Amtrak] with the insurance certificate"—which IPH admits was a required precondition, Compl. ¶ 17—only "upon execution of the contract." *Id.* This correspondence shows the parties intended to be bound by the material terms of the contract only after the contract was executed, and can only mean that Amtrak did not intend to be bound by its oral representations alone. *See Baker*, 664 A.2d at 1240; *see also Winston v. Mediafare Enter. Corp.*, 777 F.2d 78, 81–82 (2d Cir. 1985) (holding that, where the correspondence between the parties indicated a party did not intend to perform a material requirement of the alleged oral contract until after the contract was executed, it was error for the district court to conclude the parties intended to be bound by their oral agreements alone).

### iii. Other factors indicate Amtrak did not intend to be bound.

Other factors indicating that the parties did not intend to be bound by their oral agreements include: (1) whether the contract is one usually put in writing; (2) whether there are few or many details; (3) whether the value of the contract is large or small; and (4) whether the parties continue to negotiate after the date on which they allegedly reach agreement. *See Novecon*, 967 F. Supp. at 1387; *Baker*, 664 A.2d at 1240.

#### (1) The contract was the type usually put into writing.

Amtrak's previous charter train contracts with IPH were in written form. *See* Johnson Aff. ¶¶ 3–7. Accordingly, as a matter of undisputed fact, the New Ski Train contract was the type usually put into writing.

9

The New Ski Train contract is also one that would normally be put into writing as a matter of law. *See Novecon*, 967 F. Supp. at 1387 (D.D.C. 1997) (noting "written contracts may be the norm in the business world" when the agreement is "above a certain level of investment and complexity"). Both Amtrak and IPH are complex business entities, the New Ski Train contract was nuanced and complicated, and negotiations over its terms lasted several months. Compl. ¶¶ 11–24 and Ex. E thereto. The New Ski Train was to carry nearly 75,000 passengers over three months, and Amtrak's participation alone cost hundreds of thousands of dollars. Compl. ¶¶ 11, 14 and Ex. E thereto ¶ 8(i). Operation of the New Ski Train required coordination with at least ten different organizations, including local, state, and federal government entities, and required operation on rails owned by two different railroad companies. Compl. ¶ 11 and Ex. E thereto. Such a transactional environment is "markedly inhospitable to a binding oral agreement." *Baker*, 664 A.2d at 1241; *see Kagy*, 473 F.3d at 1250–51.

### (2) The alleged contract included many details.

Included with its Complaint, IPH attached a "general memorialization" of the supposed oral agreement. Compl. Ex. E. The "general memorialization" bears little resemblance to the October 21, 2009, contract, and contains dozens of additional details, terms, and conditions. Even excluding the attachments discussing train schedules, equipment, and costs, the "general memorialization" stretches over twenty-two pages, and comprises nearly one hundred paragraphs and subparagraphs governing not only IPH's relationship with Amtrak, but also IPH's relationship with the

\\\DE - 065976/000021 - 443830 v6

numerous other parties involved in the proposed operation. *Id.* "It would be difficult indeed for an oral agreement alone to set forth all the material, detailed terms and conditions governing the reciprocal obligations of the parties for this kind of project. It [is] unquestioned that a written contract was contemplated as part of the transaction." *Baker*, 664 A.2d at 1240; *see Flynn*, 431 A.2d at 547 (holding, in order to show the parties intended to be bound, there must be evidence showing "a meeting of the minds as to the variety of details usually present" in a contract of the type at issue).

### (3) The value of the contract was large.

The value IPH placed on the New Ski Train contract was in the hundreds of thousands or millions of dollars. Compl. ¶¶ 36-61. In addition, IPH understood the value of the contract to Amtrak was in the hundreds of thousands of dollars. Compl. Ex. E ¶ 8(i). As a matter of law, these amounts are large enough to show the parties did not intend to be bound by an oral agreement. *See Novecon*, 967 F. Supp. at 1387; *see also Kagy*, 473 F.3d at 1251 ("The greater the ... importance of the transaction, the more likely it is that the informal communications are intended to be preliminary only.").

### (4) The parties continued to negotiate.

IPH alleges that all of the material terms of the contract were agreed to no later than November 2, 2009. Compl. ¶ 24. The evidence shows, however, that the parties continued to negotiate after November 2. For example, the scope of the work to be performed under the contract was still uncertain as of November 16, 2009. Ex. B (Email from Ed Ellis). Ellis's e-mail on that date shows that neither IPH nor Amtrak had yet

11

agreed upon the number of days Amtrak was to supply crews, or the specific days and times those crews were to be provided. *Id.* Agreement on these terms was required before any train could run on Union Pacific's rails. Compl. Ex. C. The scope of work required by a contract is an essential material term, and continued negotiation indicates intent not to be bound. *See Kagy*, 473 F.3d at 1249; *Baker*, 664 A.2d at 1240.

### 2. The parties did not agree to all material terms.

In order to form a binding contract, both parties must agree to the same terms at the same time. *See Malone v. Saxony Co-op. Apartments, Inc.*, 763 A.2d 725, 728–29 (D.C. 2000). Thus—although the parties may have assented to certain discrete terms at various points in the negotiations—no contract is formed so long as even one material term remains unsettled at each point in the negotiation. *See id.*; *see also Georgetown Enter. Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). Likewise, a party is free to withdraw its agreement to a particular term at any point prior to forming a binding contract. *See Malone*, 763 A.2d at 729–30; *Georgetown*, 496 A.2d at 591; *see also DSE, Inc. v. United States*, 169 F.3d 21, 29 (D.C. Cir. 1999) (holding that, before the price of an acquisition was set, "the parties could walk away from the negotiations . . . at any point during the process of due diligence without incurring any liability"); *T Street Development, LLC. V. Dereje & Dereje*, 581 F. Supp. 2d 26, 32–33 (D.D.C. 2008), *aff'd*, 586 F.3d 6 (D.C. Cir. 2009). Accordingly, even if IPH is correct in contending that Amtrak agreed to a particular form of insurance and indemnity clause at an early point of the negotiations, Compl. ¶ 24, Amtrak was free to withdraw its assent

\\\DE - 065976/000021 - 443830 v6

to any or all terms under discussion, or to terminate the parties' negotiations entirely.

The correspondence between IPH and Amtrak indicates there was no point when both parties were in agreement as to all the essential terms. One term that indisputably remained unsettled was the number of crew Amtrak was to supply. There can be no doubt that—as IPH knew the price of the contract was expressly based on the number of Amtrak personnel needed to operate the train, Compl. Ex. E ¶ 8—this was a material term. See Kagy, 473 F.3d at 1253. Amtrak raised this issue with IPH on October 21, 2009, and again on November 2, 2009. Compl. Ex. B; Ex. D (Ellis Aff. ¶ 5 [Doc. 8-2]). Ellis understood that Amtrak had not determined the number of crew required as of the latter date. Ex. D (Ellis Aff. ¶ 7).

In fact, Ellis admits IPH did not know Amtrak determined to provide two crewmembers until IPH received the December 8, 2009, contract. Id. (Ellis Aff. ¶ 13). In light of its admission that the number of Amtrak crew was unsettled prior to December 8, 2009, IPH cannot now argue that—simply because the number of crew was proposed to be two on October 21, 2009, and was again two on December 8, 2009—the parties agreed Amtrak would provide two crew members throughout that time period. In short, even if all other terms were agreed upon at some point between October 21, 2009, and November 2, 2009 (the date IPH alleges in Complaint ¶ 24), or even December 7, 2009 (the date IPH alleges in Complaint ¶ 39), IPH knew Amtrak had not agreed upon the number of crew, and, henceforth, the price of its participation. After December 7, 2009, of course, IPH did not agree to Amtrak's proposed liability

coverage. "As long as the parties know that there is an essential term not yet agreed on, there is no contract." *Malone*, 763 A.2d at 729 (quoting 1A. CORBIN, CONTRACTS § 2.8m at 131 (1963)).

## CONCLUSION

In conclusion, for the reasons stated above, Amtrak is entitled to summary judgment in its favor on IPH's claim for breach of oral contract.

## Certification Pursuant to REB Civ. Practice Standard V.I.1

Amtrak has read and complied with the Practice Standards of this Court governing the formatting and marshaling of this Motion.

Respectfully submitted this 29th day of April, 2010.

    HOGAN & HARTSON LLP

    s/Dugan Bliss
    Edwin P. Aro
    Dugan Bliss
    1200 Seventeenth Street, Suite 1500
    Denver, Colorado 80202\
    303.899.7300
    303.899.7333 (fax)
    eparo@hhlaw.com
    dbliss@hhlaw.com

    ATTORNEYS FOR DEFENDANT NATIONAL
    RAILROAD PASSENGER CORPORATION

\\\DE - 065976/000021 - 443830 v6

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of April, 2010, I electronically filed the foregoing **DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR BREACH OF ORAL CONTRACT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Jeffrey D. Bursell
Godfrey & Lapuyade, P.C.
9557 South Kingston Court
Englewood, CO 80112-5952
bursell@godlap.com

Gerald Haberkorn
Robert Smeltzer
Lowis & Gellen, LLP
200 West Adams Street, Suite 1900
Chicago, IL 60606
geraldh@lowis-gellen.com
rsmeltzer@lowis-gellen.com

                                            s/Dugan Bliss

\\\DE - 065976/000021 - 443830 v6