**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Action No.  09-cv-02977-REB-KLM

IOWA PACIFIC HOLDINGS, LLC,

    Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION,

    Defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS

**Blackburn, J.**

    This matter came before me for a combined trial by jury and trial to the court on June 27 through July 7, 2010.  Plaintiff, Iowa Pacific Holdings, LLC, and defendant, National Railroad Passenger Corporation, appeared through their respective attorneys.

    The jury returned a combined verdict in favor of plaintiff for $1,149,950.00 on its claim for breach of oral contract, and a partial judgment was entered on the verdict on July 13, 2011 [#177].[1]  The matter is presently before me for resolution of plaintiff's equitable claim of promissory estoppel that was tried simultaneously.

    Having judicially noticed all relevant adjudicative facts in the file and record of this case *pro tanto*; having considered the evidence educed in its various forms; having determined the credibility of the witnesses; having weighed the evidence; having considered the reasons stated, arguments advanced, and the authorities cited by the

---

[1] "[#177]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

parties; and being otherwise sufficiently advised of the facts and premises, I enter the following findings of fact,[2] conclusions of law, and orders.[3]

## FINDINGS OF FACT

1. The parties to this lawsuit are the plaintiff, Iowa Pacific Holdings, LLC ("IPH"), and the defendant, National Railroad Passenger Corporation ("Amtrak"). IPH operates various excursion trains throughout the United States. Edwin Ellis ("Ellis") is the founder and president of IPH. He has worked in the rail industry since 1973, including several years for Amtrak. IPH operates nine railways in the United States and the United Kingdom, including the San Luis & Rio Grande Scenic Railway, a passenger train that traverses La Veta Pass in southern Colorado. With a continuous grade of three percent, this train traverses the highest standard gauge crossing active in the United States today.

2. For nearly fifty years, the Denver & Rio Grande Western Railroad operated the Denver to Winter Park, Colorado, "Ski Train." The rail lines that the train used are owned by Union Pacific Railroad Company ("UP"), which operates its own freight trains over the same lines, as well as others. Ansco Investment Co. ("Ansco"), a subsidiary of the Anschutz Corporation, acquired the Ski Train in 1988, and continued to operate it through the end of the 2008-2009 ski season.

3. In April, 2009, Ansco elected not to continue operations of the Ski Train, largely due to escalating costs, including insurance costs. Ansco, however, retained the

---

[2] My findings of fact are based on a preponderance of the evidence

[3] I state my findings of fact specifically and conclusions of law separately as required by Fed. R. Civ. P. 52(a)(1). Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

rights to resume operations of the Ski Train in the future.

     4.  In August, 2009, IPH contacted Ansco, seeking to acquire Ansco's rights to the Ski Train, but no deal was reached. Ellis inquired also whether UP would be willing to provide rail access and a crew for a revived ski train, as it had for Ansco. UP declined and directed Ellis to work with Amtrak, which had rights to operate passenger trains on the Denver to Winter Park line.

     5.  Ellis was informed that he should contact Teresa Hughey ("Hughey"), Amtrak's Director of Charter and Group Services to attempt to negotiate terms for the proposed revival of the ski train. On August 10, 2009, Ellis presented Hughey with a proposed schedule and a list of the locomotives and passenger cars that would be used for the ski train (called the "consist").

     6.  Amtrak submitted that proposal to UP, with some revisions to the schedule, for its approval. On September 4, 2009, UP granted conditional approval for Amtrak to operate the new ski train over its rail line.[4]

---

[4] The approval included the following relevant conditions:

    . . . .

> 2. Amtrak must confirm that the private rail equipment is suitable for use in Amtrak service and complies with applicable FRA [Federal Railroad Administration] standards
> 3. Amtrak must confirm that any use of the term "Ski Train" or other trademark has the approval of Ansco Investment Company
> 4. Any significant changes in the train schedule or dates or operation must be approved by Union Pacific
> 5. This approval applies only to the operating plan for the 2009-2010 season, recognizing that Ansco Investment Company retains the right ot operate the Ski Train in future years.

(Trial Exh. 5.)

7. On October 21, 2009, Hughey sent Ellis a copy of Amtrak's standard form charter train contract. This form is one Amtrak typically uses for single-car, one-day charter trains. The contract contained numerous blanks. However, it did specify certain insurance and indemnity provisions, specifically, that general liability insurance of two million dollars was required. Hughey specifically directed Ellis to these provisions of the contract because, *inter alia*, they required IPH to designate Amtrak as an additional insured on its own policy of insurance. A week later, Ellis reported that IPH's insurance carrier had no problem with the insurance provisions of the contract. Hughey and Ellis never again discussed the terms of insurance.

8. UP required Ansco to carry $100 million in insurance coverage when Ansco operated the Ski Train. IPH carried $100 million in insurance coverage.

9. Throughout the September and October, 2009, time frame, Ellis repeatedly urged Amtrak to approve or commit to the train so IPH could begin preparations for the opening of the 2009-2010 ski season. On November 2, 2009, Ellis emailed Hughey requesting "some kind of conditional approval" for operation of the train. Hughey responded that she would provide "something" in a separate email, and cautioned, "but bear in mind that it will include contingencies and caveats." (Tr. Exh. 44.)

10. Later that same day, Hughey emailed Ellis, confirming that Amtrak would provide a two-person crew "pending approval from Division," and also reiterated the earlier stated conditions imposed by UP. (***See supra***, note 2.) The next day, Ellis responded that "[w]e are in agreement on every aspect" and stated that IPH would begin moving equipment toward Denver and selling tickets. Hughey did not reply to this email.

4

11. However, some time in or around October, 2009, Amtrak determined internally that the proposed ski train was more akin to a commuter train than a charter train. Accordingly, Michael Franke ("Franke"), who oversees contracts for passenger service trains in Amtrak's central region, assumed responsibility for the negotiations.

12. At the same time, in late October, 2009, Doug Cook, senior representative of Amtrak's risk management group, was asked by in-house counsel to review the provisions of a proposed contract for the proposed IPH ski train. He recommended that IPH be required to carry $200 million in liability insurance, which corresponded with the statutory cap on Amtrak's liability. He recommended further that any contract require IPH to indemnify Amtrak for any liability above the statutory cap and include coverage for Amtrak's and/or UP's negligence and intentional misconduct, as well as punitive damages.

13. Cook's recommendation regarding the amount of insurance was based on the perceived risks associated with operation of the train, the frequency of trips, the number of anticipated passengers, the fact that Amtrak equipment was not used for the consist, as well as other factors, and was on par with other contracts of a similar nature in which Amtrak has participated in the past.

14. Ellis contacted Franke in mid-November, 2009, acknowledging his understanding that Franke was now negotiating the contract on behalf of Amtrak. Soon thereafter, Ellis again called Franke, inquiring about the status of a proposed draft of the contract. Franke testified that during that meeting, the subject of insurance was raised and that he informed Ellis that $200 million in coverage, including the additional terms for indemnification that were recommended by Cook, would be required, . Ellis did not

then voice any objection or insist on adherence to putative contractual provisions to the contrary.

15. A revised draft contract containing, *inter alia*, the $200 million insurance and indemnification provisions, was forwarded to Ellis on December 8, 2009. The draft contract also made changes to the proposed schedule and to the pricing structure.

16. At trial, Ellis and Franke disagreed about whether Ellis or anyone else associated with IPH initially protested that the price, schedule, and insurance and indemnity terms of the December 8 contract varied significantly from those set forth in the blank form contract Hughey originally forwarded to Ellis. Regardless, IPH did not immediately reject the insurance requirements or withdraw from negotiations. Instead, it made efforts to secure insurance coverage on the terms required by Amtrak in the December 8 contract.

17. Between November 2, and December 8, 2009, IPH expended in excess of $1.6 million in anticipation of being able to operate a ski train for the 2009-2010 season. However, it ultimately was unable to secure on commercially reasonable terms the insurance coverage demanded by Amtrak. Additionally, IPH's equipment failed a Federal Railway Administration safety inspection on December 21, 2009. That same day, UP imposed new conditions on operation of the proposed ski train, and IPH filed this lawsuit.

18. The legal claim of breach of oral contract was tried to the jury, which returned a verdict in favor of plaintiff. The equitable claim of promissory estoppel now is before me for resolution.

**CONCLUSIONS OF LAW**

1. I have jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity of citizenship). All parties are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

2. Venue is proper in the United States District Court for the District of Colorado.

3. To the extent necessary, I approve, adopt, reiterate, and incorporate my foregoing findings of fact.

4. Colorado law controls my resolution of the claim of promissory estoppel in this diversity case. ***Erie Railroad Co. v. Tompkins***, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); ***Royal Maccabees Life Insurance Co. v. Choren***, 393 F.3d 1175, 1180 (10th Cir. 2005).

5. In assessing the credibility of each witness who testified at trial, I considered all facts and circumstances shown by the evidence that affect the credibility of the witness, including the following factors: the witness's means of knowledge, ability to observe, and strength of memory; the manner in which the witness might be affected by the outcome of the litigation; the relationship the witness has to either party in the case; and the extent to which the witness is either supported or contradicted by other witnesses or evidence presented at trial.

6. IPH seeks recovery on the equitable theory of promissory estoppel. Under Colorado law "[t]he elements of a promissory estoppel claim are (1) the promisor made a promise to the promisee; (2) the promisor should have reasonably expected that the promise would induce action or forbearance by the promisee; (3) the promisee

reasonably relied on the promise to his or her detriment; and (4) the promise must be enforced to prevent injustice." ***Cherokee Metropolitan District v. Simpson***, 148 P.3d 142, 151 (Colo. 2006). Where a party proves these elements by a preponderance of the evidence, neither the lack of a written contract, ***see Nelson v. Elway***, 908 P.2d 102, 110 (Colo. 1995), nor the failure to mutually agree on all essential terms, ***see Kiely v. St. Germain***, 670 P.2d 764, 767 (Colo. 1983), will defeat the claim.

7. The essence of a claim for promissory estoppel "is the plaintiff's reasonable reliance on the defendant's representations." ***Nelson***, 908 P.2d at 110. ***See also Kiely***, 670 P.2d at 767 ("Justifiable reliance on the representations of another is the gist of this action.").

8. IPH asserts that the alleged promise on which it reasonably relied to its detriment was that Amtrak would provide a two-person crew for the ski train. Although it is clear that such was the *only* essential term to which the parties agreed unconditionally, I find and conclude that it was not reasonable for IPH to rely on such a narrow promise in deciding to move forward with preparations and expenditures to operate the ski train, much less to the extent it did.

9. I recognize that the Colorado Supreme Court has noted in dicta that promissory estoppel "is often appropriate when parties have not mutually agreed on all the essential terms of a proposed transaction." ***Keily***, 670 P.2d at 767 (citing ***Hoffman v. Red Owl Stores, Inc.***, 133 N.W.2d 267 (Wis. 1965)). Of course, the parties in ***Keily*** *had* agreed to all essential terms of their proposed contract, which even went so far as to be reduced to writing. ***See id.*** at 766. Moreover, the Wisconsin case to which the

***Keily*** court cited makes clear that although a valid claim for promissory estoppel does not require "that the promise giving rise to the cause of action must be so comprehensive in scope as to meet the requirements of an offer that would ripen into a contract if accepted by the promisee," the promise must be one that "the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee." ***Hoffman***, 133 N.W.2d at 275.

10. With the foregoing perspective and purview of the promissory estoppel doctrine in mind, and despite the fact that a failure to agree on all essential terms of the contract is not necessarily fatal to a promissory estoppel claim, I nevertheless find IPH's claim fatally myopic in its scope. In the absence of a broader promise to provide an actual train, i.e.*,* the actual consist, approved by Amtrak, an agreement to provide only a crew for an otherwise hypothetical train could not reasonably have justified Ellis or IPH investing *any* money in the project, let alone some $1.6 million.

11. Moreover, it is the opinion and finding of this court that Ellis did not, *in fact*, rely on the mere promise to provide the crew in committing IPH's resources to the project. Instead, the agreement regarding the crew was merely the last in a series of essential terms – including the price, the schedule, the consist, and insurance – as to which Ellis testified he believed IPH and Amtrak were in agreement. Agreement to provide a crew, in the absence of agreement as to these other essential terms, which only together would make for a viable ski train, is no more than promissory estoppel in the air.

12. Moreover, I do not find Ellis's testimony that IPH and Amtrak had agreed to

these other essential terms persuasive. In particular, I note that it was not reasonable for Ellis to rely on the $2 million insurance requirement referenced in the blank, charter train, form contract Hughey originally sent to him. Ellis is a sophisticated railwayman, who touted his 38 years of experience in the railway industry. He clearly is knowledgeable about both the train business in general and, as a former employee, Amtrak's commuter train business in particular. He knows the differences between and among charter, passenger, and commuter trains, and the various risks associated with operation of each type. He knew that UP had required Ansco to carry $100 million in insurance when it operated the Ski Train. He knows that IPH itself carries $100 million in coverage for other, similar operations. Given both his general and specific knowledge, Ellis could not reasonably have believed that IPH would be required to secure only $2 million in insurance for the ski train.

13. In addition, I find and conclude that Ellis did not, in fact, rely on the $2 million figure in moving forward on the ski train project. Instead, when presented with the December 8, 2009, draft contract, instead of objecting immediately, he made substantial efforts to secure insurance coverage on the terms demanded by Amtrak. The $200 million insurance and concomitant indemnity requirements only became problematic – and ultimately fodder for litigation – after IPH realized and concluded that it would not be able to secure such insurance on what it considered to be commercially reasonable terms.

14. Accordingly, I find and conclude that IPH has failed to prove the reasonable reliance required to sustain its burden of proof by a preponderance of the evidence on

its equitable claim of promissory estoppel.[5] Thus, Amtrak is entitled to judgment on that claim.

15. The partial **Final Judgment** on the legal breach of oral contract claim entered by the clerk of the court on July 13, 2011 [#177], provided for the award of costs to the plaintiff, and the plaintiff has filed its proposed bill of costs with the clerk ([#178] filed July 25, 2011). My discretion to award costs is broad enough to encompass the denial of costs to a party that has been only partially successful on its claims. *See Cantrell v. International Brotherhood of Electrical Workers, AFL-CIO, Local 2021*, 69 F.3d 456, 459 (10th Cir. 1995). Nevertheless, given that the plaintiff recovered almost all the damages it sought on its legal claim for breach of oral contract, I do not believe this is a case in which it would be appropriate to exercise my discretion to abrogate the award of costs.

16. Finally, to the extent that any claim, affirmative defense, defense, objection, or argument is not specifically addressed in this opinion or in any other relevant order, I have considered it, but rejected it.

### ORDERS

**THEREFORE, IT IS ORDERED**, as follows:

1. That the claim for promissory estoppel of the plaintiff, Iowa Pacific Holdings, LLC, is **RESOLVED** against the plaintiff and in favor of the defendant, National Railroad Passenger Corporation; and

---

[5] The burden of persuasion requires a preponderance of the evidence. §13-25-127(1), C.R.S. (". . . the burden of proof in any civil action shall be by a preponderance of the evidence.")

2.  That the partial **Final Judgment** [#177] filed July 13, 2011, is **SUPPLEMENTED** to provide that judgment **SHALL ENTER** on behalf of the defendant, National Railroad Passenger Corporation, against the plaintiff, Iowa Pacific Holdings, LLC, on its claim for promissory estoppel, which claim is **DISMISSED WITH PREJUDICE**.

Dated August 16, 2011, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge